May it please the Court, McCain-Newmeister, on behalf of Secretary Becerra and the United States Department of Health and Human Services. Through the Emergency Medical Treatment and Labor Act, Congress requires Medicare-funded hospitals to ensure that individuals experiencing a medical emergency receive stabilizing care. EMTALA's framework speaks in broad, general terms. It neither specifies certain treatments for certain conditions, nor exempts any kind of potential care from its scope. Rather, it relies on the expert judgment of a hospital's medical professionals to determine the treatment necessary to stabilize the condition presented. And EMTALA expressly preempts any state law that directly conflicts with its requirements. Counsel, let me ask you, at the preliminary injunction hearing, wasn't it admitted by HHS that HHS hasn't issued a guidance document specific like this one because there was not a need for it? It's correct that there's nothing exactly like this document, Your Honor, but HHS did issue very similar guidance in September of 2021. And that guidance specific... Is this a final rule or is your contention that it's not final and therefore not reviewable? That's correct, Your Honor. Our contention is that this is not a final agency action subject to review. So it's not yet enforceable, correct? So what HHS enforces is the statute itself. The guidance document is non-binding. It's simply setting forth the agency's view of the statute and ultimately the agency enforces the statutory requirements themselves. Well, so it's not a final rule, but someone can be held responsible for violating it because the statute, which is not as specific... I'm sorry, this sounds like government deeds to most people. You're going to have to walk through this in more detail. Is it new or is it not new? It's not new, Your Honor. This is not a new policy and the guidance makes that clear. It says it's not a new policy. It's reminding hospitals of what the statute has always required. So did this come up at any point in Dobbs, at any point in that litigation, that we had this federal statute that seemed to sweep a large swath across healthcare providers insofar as a mandatory abortion provision? I'm not aware whether this came up in Dobbs or not, Your Honor, but our physician declarations in the record explain that physicians have always understood EMTALA to apply this way and they still understand that their obligations remain the same. The agency was simply reminding providers that this is what EMTALA has always required. Dobbs was issued and there might be changes going on in state laws, but that doesn't change EMTALA itself and its obligations. You concede that this rule is the result of Dobbs. It seems pretty obvious. Is that not correct? So first of all, the guidance document explains that the reason it's being issued is that there are changes going on in state law, but that doesn't mean that it's new policy. The agency has done this in circumstances before. For instance, with COVID or the Ebola virus, it'll issue a guidance document saying there are circumstances going on on the ground right now, but remember, while you're dealing with those, you still have to follow the requirements of EMTALA in handling unforeseen challenges. That's essentially what this guidance says. You mentioned preemption earlier before I started asking questions. Where is that? That's a statutory provision that says state law is preempted on this particular matter that's covered by this particular rule. Is that what you're telling me? So the preemption provision is in the statute itself, Your Honor. It's subsection F, and it says that any state law is preempted to the extent there's a direct conflict with the requirement in EMTALA. Is there a direct conflict here? Yes, Your Honor. I think also, I mean, Texas allows abortion to happen when the life of the mother is under threat, correct? Texas does have some exceptions, Your Honor, but we think that, so— Well, I mean, and I guess I'm trying to figure out is whether those exceptions really cover pretty much the stabilizing care that EMTALA would require in this circumstance. In other words, I mean, EMTALA surely doesn't mention abortion. It's correct, Your Honor, the same way that it doesn't mention anything. It doesn't mention lots of things because it doesn't direct care, but it surely doesn't say because it doesn't mention abortion that abortion is the go-to for stabilizing care. In other words, Texas law sort of says the same thing. We allow it under certain exceptions, and one of those is the life of the mother. So I think two points in response, Your Honor. First is, ultimately, whether there is daylight between the text of EMTALA and how the stabilizing requirement works and how Texas law actually functions on the ground is something that was Texas' burden to demonstrate that direct conflict, and it was our position in district court that they didn't demonstrate a concrete conflict. But putting that aside, for a general, any sort of hypothetical state law that regulates the provision of abortion, it is possible that there can be a direct conflict with the stabilization requirement because of how the stabilization requirement is structured, and this is subsection E3A of the statute, which provides that the hospital has to offer whatever treatment is necessary to assure within a reasonable medical probability that the condition is not going to materially deteriorate. And so— Yeah, but the statute actually speaks to women who are in labor and pregnant women, and when it addresses those things, it says, well, you've got to provide care, including delivery. And then it says you've also got to sort of watch out for the unborn child and the mother. I don't see where abortion factors into that language that actually is in Intala. So, Your Honor, thank you. I would like to focus on that language because I think this is a very important part of this case, and it's simply not sufficient to pluck two words out of the statute and draw broad conclusions about what Congress must have intended, because ultimately, we know what Congress intended. It's what Congress wrote in the statute. Well, there's words in the statute that address the unborn child and the pregnant mother, but there's no word in there that says abortion services. Yes, Your Honor, but I want to focus very particularly on those words, how Congress used— Rather than plucking them out of the statute, you're plucking something out of thin air and saying it's in the statute. Not saying it's not. I'm just saying you've got this language in the statute that actually addresses the stabilizing care that has to happen with a pregnant woman, and it has to care for the unborn child. Yes, Your Honor, but Congress— Abortion is sort of antithetical to the unborn child's well-being, right? So, when Congress required that the unborn child be factored into decision-making, it did it in a very specific way. It wasn't creating broad obligations. It was creating discrete circumstances in which the health or risks of the child are relevant to the decision-making. Is there a stabilizing obligation for the unborn child as well? So the stabilizing obligation in the statute is to stabilize the emergency medical condition, and the statute makes clear— Does that stabilizing requirement apply to both the pregnant mom and the unborn child? It applies to the condition, which the statute says is the condition that belongs to the individual. The individual— It mentions two individuals when it talks about a pregnant woman or a woman in labor. I disagree, Your Honor. I think the statute is very clear that when it's talking about individual, it's referring to the pregnant woman, and this is clear if you look at the text of the statute in several places. Subsection C2a and C1a3, they refer separately to an individual and an unborn child. We have a background statutory definition of individual from the Dictionary Act. That's 1 U.S.C. Section 8 that defines individual not to include a fetus. And we have the statute itself, which says that these obligations run to individuals. But did Congress modify the statute itself so as to create duties to stabilize both the pregnant woman and her unborn child? Isn't that the language in the statute that Congress modified into the statute? It did modify the statute, but it was doing something very specific in creating that amendment. Essentially, Congress was expanding the circumstances in which a pregnant woman can be considered to have an emergency medical condition. If a pregnant woman comes in to an emergency department and is screened, she can have an emergency medical condition requiring treatment if either her health is in serious jeopardy under the terms of the statute or the health of her unborn child. And there are a number of conditions under which the unborn child might have their health in serious jeopardy, but the woman's health doesn't yet meet that standard. I want to make sure I understand your response to one of Judge Wilson's questions. Would it be—maybe I'm asking the same question, but in my mind it would make it clearer—would something like a Venn diagram—and I'm asking about the Texas statute—would a Venn diagram be an accurate depiction of medical cases that are covered by both the statute, the federal statute, as well as the Texas provision? Wouldn't there be cases that qualify as stabilization and protecting the life of the mother under the statute? Your Honor, that's correct. There are circumstances in which Texas would agree that pregnancy termination is stabilizing care. So there would not be a conflict, at least among those cases? Well, for those cases there wouldn't be a conflict, Your Honor, but whether there are cases outside that example, Texas simply didn't point to facts demonstrating that. But just to step back to Judge Wilson's questions earlier, there's another point that I think is important in reading the statute. Congress was specific in how it talked about the unborn child, but it also was general in how it spoke to stabilizing treatment and how physicians are to make that determination. Congress didn't specify any particular form of treatment. It set forth a framework so that physicians would use their judgment and determine what was required under the circumstances. And remember, Congress knows how to legislate specifically about abortion. It is very familiar with crafting abortion-specific rules, including rules that prevent the preemption of state abortion laws. We cite some of those at page 30 and 31 of our brief. Congress very intentionally did not carve out abortion in this statute. It treated it the same as all other emergency medical conditions. It was aware that this could arise—sorry, abortion the same as all other treatments. It was aware that emergency medical conditions can arise for pregnant individuals because the statute specifies them, and Congress determined to ultimately leave it up to the judgment of medical professionals to determine what's required under the circumstances. Counsel, let me ask you two things you said earlier. This is neither—start with the first one, that this is nothing new. You also said there's nothing mandatory. Isn't it new, at least to the extent of saying after this sea change in the law in the country on abortion that Dobbs, Jackson Hole, Women's Health created, even restating the same thing is new? It's saying that HHS has looked at what's happened in the Supreme Court. Here is the law now, and whether it's the same as before or not, it's a new statement that tells those to whom it applies that this is the law, and don't worry about Dobbs. Our old guidance is still operative. Seems to me that that's—there are new ingredients to that, and of course, your friends on the other side say there's more to the change—more changes in that, but putting that aside, what's your reaction to that question? So, Your Honor, it's not new in the relevant sense because the obligations on hospitals remain the same. The fact that pregnancy termination can be stabilized— No, you're interpreting new in a different way. It does seem to me that there's a new—there's a need for this, and it's filling that need in a way that the state disagrees with, but nonetheless, stating this is the law. We don't even have to tweak it. Seems to me that is a new statement because you have a new landscape. It is recognizing that there are new factual circumstances, but it's making clear that the law hasn't changed, and that ultimately, the relevant standard here— You also say there's nothing mandatory about it. There are certainly words that are mandatory in it. Maybe your argument is that comes from the statute and not from the guidance. Even the cover letter from the Secretary has the word must maybe more than one time in it, and specifically about abortion. This is what must be done by the providers of health care. It just seems hard for me to say—to see your argument that there's nothing mandatory in this guidance. I think what Your Honor said was correct, that we are drawing that from the statute. Essentially, the guidance is saying that if a physician is following the statutory standard and determining that under these circumstances, the care— Following the statutory standards as interpreted by the Secretary. Following the statutory standards in the statute, Your Honor. Determining that this is the only treatment that is necessary to prevent material deterioration of the condition. And if that medical expert judgment is that it requires terminating the pregnancy, and there's a state law that prevents that treatment, it's preempted. And I just want to also highlight, Your Honor, that regardless of the merits of these claims, the scope of relief that was issued by the District Court extends far beyond the concrete harms that plaintiffs have alleged here. And so even if there was this conflict with state law, the injunction that was granted prevents HHS from enforcing EMTALA to require abortions, even where it would be consistent with state law—abortions for which no plaintiff has any objection in this case. And so at the very least, we'd ask this Court to narrow the scope. Because I read your brief, and as you said it just now, your argument about the breadth is just that it doesn't allow Texas' own acknowledgement of when abortion is proper to be enforced by you. That's right. That HHS should have the right to enforce what is basically the requirements of—that you see under this statute that are the same requirements under Texas law. And you want to be able to enforce those. Yes. Where Texas law says that providers can exercise their medical judgment and lawfully terminate a pregnancy under Texas law, that EMTALA—the obligations of EMTALA apply the same way they would for any other treatment, even if there is a conflict beyond the scope of Texas law. All right, Counsel. Thank you. Counsel, before we hear from your opponent, one last question, if I may. You haven't uttered the C-word. Is HHS relying at all on Chevron? We're not, Your Honor. We don't think that that framework is relevant to this case. Thank you. Thank you. The C-word. May it please the Court. After the Supreme Court overruled Roe v. Wade, President Biden announced by executive order that the federal government is taking action to promote access to abortion. This case is about the actions of one federal agency and the new action it took to deal with the legal change resulting from Dobbs. As directed by the President, the Department of Health and Human Services issued a memorandum telling the enforcers of Medicare law that a 1986 statute enacted to prevent patient dumping also requires doctors to perform abortions, even in violation of state law and without regard to the unborn child. Is there a conflict here? I mean, in other words, per our questions to counsel opposite, Texas law allows abortions in case of the life of the mother or risk to the mother, right? Correct. So, I mean, are there situations where stabilizing treatment would not overlap with what Texas law allows? I mean, is there a conflict? Properly understanding EMTALA, no. Texas law is perfectly consistent with the stabilization requirement and allows for abortions to save the life of the mother under all of those circumstances. But the memorandum goes farther than that. For example, on page one, it redefines the circumstances where stabilization requires as any time a medical condition is likely to become emergent. Emergent doesn't appear in EMTALA at all, but if the memo is trying to refer to emergency medical condition, emergency medical condition is defined in the present tense. It's not something that is likely to become emergent. It's a present medical emergency. And Texas law allows abortion under circumstances of a present medical emergency, but not any time abortion is likely to become emergent. Well, there's a summary on page one. When a state law prohibits abortion, it does not include an exception for the life of the pregnant person, some might say the mother, or draws the exception more narrowly than the statute. Is that what you're saying, that the breadth of what's in this guidance overwhelms the situations in which whatever the phrasing is for the health needs of the mother? Yes. The memorandum takes the position that Texas law would be inconsistent with EMTALA based on direct conflict with the stabilized provision of the statute. That's the memorandum at page three. And I would agree, that's the most direct statement in the memo, among many others, claiming that EMTALA overrides background state law. And that position goes far beyond abortion, although that was the specific context in which the secretary issued this interpretation. Counsel, do you concede that the federal law can, in some instances, regulate the practice of medicine, or are you arguing that that's exclusively a state right to regulate the practice of medicine? I'm talking generally. Yes and no, Your Honor. Section 1395 of the Medicare Act prohibits the federal government from acting as supervising the practice of medicine. So in the sense of the substance of what procedures are performed, the scope of practice, and what is lawful, that is for the states to determine. The federal government is imposing conditions on hospitals receiving Medicare and Medicaid funds. So the statute, Congress has said that the federal government is not trying to regulate the practice of medicine. Now, if we said it in very general terms, in a sense, it regulates the practice of medicine because, in practicality, on the ground, doctors are trying to comply with their EMTALA obligations and all the other Medicare Act obligations. But EMTALA was enacted to address a specific problem, patient dumping, hospitals refusing to treat indigent patients. It was not intended as a federal malpractice statute. The Seventh Circuit recognized in a 2022 decision, Martindale v. Indiana Health, that every federal court has recognized this is not a federal malpractice statute. It does not set out standards of care. The government says in the reply that that only applies to the screening requirement. But the Seventh Circuit said that just last year in a stabilization case. So there's no distinction there between screening and stabilization. Let me ask you this, too, and I know you're going to get to it, so I hate to take this out of order. But the last thing we discussed, I believe, with your friend on the other side was the scope of the injunctive relief. Do you agree with the overly broad nature of it, that there should be at least some sort of carve-out for the Texas statute, those cases that would be in compliance? No, Your Honor. We don't agree with that. We think the judge already crafted a very narrow injunction, narrower than the full relief that the state asked for. But just to elaborate on that a little bit, the injury to Texas goes beyond just abortions that would violate state law. Because Texas law, while it makes abortion lawful, it never mandates it. And this guidance goes much further than EMTALA in mandating abortions under some circumstances by telling physicians that they have to perform an abortion and eliminating the duty to the unborn child. So Texas's interest in protecting unborn children goes beyond just that. And, of course, limiting the injunction wouldn't redress the procedural injury of not having been able to participate in notice and comment and be heard on the department's legal position regarding the interaction of post-Dobbs state laws and EMTALA. So with that, I'll just turn back briefly to the question of whether this is final agency action. The memorandum takes a number of legal positions that go beyond EMTALA. The one I'll focus on is the one we've already talked about with regard to preemption. This is the secretary taking a legal position on how the general direct conflict standard in subsection F applies to this particular circumstance of abortions and state laws that might prohibit them. That is, even if the government were correct in its interpretation of the statute, that is the government taking a legal position regarding how the statute applies. It's not just a restatement of the statute. It's an application of the statute's general standards. And under this court's decision in Texas v. EEOC, it's a legal position binding on the agency, so it's final agency action. That also means that it would qualify as a substantive rule under Texas v. EEOC. Part 4A of that decision explains that when an agency action is final because it sets out a legal position that's binding on the agency, that also makes it a substantive rule. So it certainly meets the lower threshold for requiring notice and comment on the Medicare Act, which is based on a substantive legal standard. I'll just turn briefly back to the merits of the preemption analysis to make a couple of additional points. There are three doctrinal reasons why the memorandum's position on preemption is wrong. The first, EMTALA's direct conflict provision. EMTALA's direct conflict provision limits preemption. This is almost an anti-preemption provision requiring a direct conflict. The requirements of EMTALA are to screen and to stabilize. That's stated at a high level of generality, and it leaves background law in place. Because again, EMTALA does not create a federal malpractice regime or incorporate standards of care. Indeed, In re Baby K, the one case that the government cites finding a direct conflict, stated that EMTALA does not incorporate standards of care. Now, the government also agrees in its briefing that the stabilization requirement is, quote, contextual or situational. That's a recognition that on the ground, doctors have to provide some stabilizing treatment. They can't turn indigent patients away. But they are always operating within the background law that governs them. They couldn't administer a controlled substance in violation of law, even if a physician thought that that was a way to stabilize a patient. And even if the physician thought that was the only way to stabilize a patient. The organ donation example, I think, makes it very, very clear that physicians are not authorized or required by EMTALA to act outside the law. There could be a circumstance where a patient comes into the ER and the only way to stabilize them is an organ transplant. No one would think that the hospital has violated EMTALA by failing to go and unlawfully steal an organ or somehow acquire an organ outside of the governing law. So the government's position that doctors are allowed, that it is doctors who always get to make the decision about what stabilizing treatment involves, is untenable to the extent it allows doctors to act outside the law. Just briefly, two other doctrinal reasons. We've already discussed Section 1395. The federal government is not to supervise the practice of medicine. If the federal government is... I'm sorry, may I just briefly finish, Your Honor? Briefly. The federal government would be supervising the practice of medicine if it authorized or required doctors to act outside of their medical license, which is what they would be doing if they performed a violation of... or an abortion in violation of Texas law. All right, Counselor. May it please the Court. Your Honors, Ryan Bangert on behalf of Appellees Aplog and CMDA. The memorandum is both new and highly disruptive to the way that my client's members practice medicine. As Your Honors have observed, it's new, certainly in light of the fact that it was issued only weeks after the Dobbs decision. And for the first time in EMTALA's history, specifically mandates, places a federal mandate on physicians to perform abortions where none was ever found before in the text of EMTALA. In fact, the weight of federal law runs the opposite direction. From the Hyatt Amendments, which prohibit federal funding for abortion, to Church Amendments to Code Snow, which protect the conscience of those who will not perform abortion. Now, immediately after Dobbs, we have emerging from the text of a statute that was only meant to prevent dumping of patients. It was filling a lacuna in state law to prevent the abandonment of uninsured patients at the door of emergency rooms. Emerging from that limited statute is now a sweeping federal mandate to perform abortion. And not only that, but as my friend on the other side has argued, the federal government now interprets EMTALA to be void and completely absent from EMTALA any obligation to treat unborn children. Even though Congress specifically amended EMTALA in 1989 to include multiple references to unborn children as being an object of protection under the statute. And this substantially disrupts the way in which my clients practice medicine. My clients have religious and ethical objections to performing abortion. Have there been enforcement actions that you're aware of, actual enforcement actions? I think in the appellant's brief, if I'm not mistaken, there's reference to something in Missouri. Do we know that those are happening and what the status of those? Yes, Your Honor. There were letters that were sent to some physicians in Missouri. I believe those are still at the administrative stage. There's also a lawsuit currently pending that's going in bank to the Ninth Circuit, in which the federal government has sued the state of Idaho over its abortion statute. Also, it was mentioned earlier about the need or the perceived need by the federal government to address these instances where federal law or state laws may not address it. Where every state, every state provides for an exception to their abortion statutes, even if they prohibit it, to allow for the separation of the unborn child from the mother in the case of a threat to the life of the mother. So there's no need for the federal government to address that issue. And I think it's clear that this sweeps far broader than that very narrow circumstance that my friend on the other side has identified, because it eliminates the obligation to treat the unborn child. My friend on the other side has argued that the addition of the unborn child to the statute is simply an effort to further treatment for the health of the mother. It's instrumental in a sense. Only if the health of the mother is somehow threatened by a difficulty the unborn child is experiencing should we treat. That cannot be the case, Your Honor. That simply cannot be the case. What about instances where women present to emergency rooms in premature labor where the baby is not yet viable? The statute, if read the way my friend would read it, would simply allow hospitals to send them home, had it not been amended to account for the unborn child. That's why the unborn child here is so critical. The duty to stabilize runs to the condition. And the condition is defined specifically in terms of the unborn child. Otherwise, you would have completely irrational and inhumane results. Physicians must adopt a two-patient paradigm under the statute, and that's precisely what it requires. Any effort to read that two-patient paradigm out of the statute is inhumane, nonsensical, and cuts directly against the text of the statute. But it's necessary. In order to reach the conclusion that EMTALA requires and mandates abortion, it is necessary for the federal government to make that turn. It is necessary for the federal government to read the statute atextually and eliminate protection for the unborn child. Why? Because only then can you reach the conclusion that EMTALA mandates abortion. There is no such mandate. You'll agree that stabilization may include abortion care. Your Honor, I think that the stabilization is left to the law of the state. And that's what EMTALA does. To the law of the state or to the practicing physicians in the ER? I mean, in other words, where do you read stabilization not to include it? Your Honor, stabilization in the judgment of physicians. There are instances where physicians may make the judgment that separation of the unborn child from the mother is necessary to preserve the life of the mother. There are absolutely circumstances where that occurs. It's throughout the declarations of my clients. In this case, in fact, I think it's important to note, there's no appellee before the court today that would say under those circumstances where the life of the mother is threatened and there's no way to save the life of the mother but through separation, there's no appellee today who would say that should not be done. All of my doctors in their declarations say they would do that. The problem with the interpretation the federal government is taking is it sweeps far beyond those instances. In the memorandum itself is called out incomplete medical abortions. My physician, my doctors in their declarations at the district court, declaration of Donna Harrison, paragraph 15. She specifically states that there are instances of incomplete medical abortions, mifepristone-induced abortions, chemically-induced abortions, where there's fetal cardiac activity still detectable. The baby is still alive. And yet the memorandum says those are instances of emergency medical conditions where abortion is appropriate. And in those instances where the baby could still be saved, the mandate, the memorandum purports to require abortion against the conscience of my doctors, against state law. That is a significant departure. And why is that so significant? Look at the context in which this memorandum was issued. Immediately after Dobbs, it was issued within a week of a separate mandate requiring pharmacies to carry mifepristone, the abortion drug. It was issued within the context of the federal government altering the REMS, the risk evaluation and mitigation strategy for the distribution of mifepristone to remove the inpatient dispensing requirement, a case that's currently sub judice before this court. And so all of these moves were made by the federal government in light of Dobbs. This is part of a much, much broader pattern where the federal government, in line with President Biden's executive order, is making moves through the administrative state to increase access to abortion. That's what this is about. This is about forcing emergency room doctors to perform abortions, even in cases where there are incomplete medical abortions, mifepristone induced abortions, where the baby is still alive. And by the way, my friend's declarations at the district court level, they admitted in the declarations of Dr. Hader, where she said there are instances of incomplete medical abortions where there is remaining fetal cardiac activity. The baby is still alive. It does happen. And yet in those instances, the memorandum would purport to require abortion. And why is that? Why is that? Because there's no longer a duty to the unborn child. It's been eliminated entirely, your honor. Your honors have also raised questions about the scope of relief that was awarded by the district court. I simply want to echo what my colleague said and also point out that there's no real way to trim this injunction back to address the harm to my clients because the memorandum removes any reference to the unborn child. And there's no way to award injunctive relief to add words back in. We can't simply reinsert the words that are missing. And the entirety of the memorandum is premised on this idea that duties to the unborn child are absent. There's no way to reform that fatal defect in the memorandum. And that fatal defect underpins the entirety of what the memorandum is doing here, which is to manufacture a national abortion mandate out of a very modest federal statute that simply exists to prevent the abandonment of patients at the emergency room door. Your honors, beyond that, I would simply point out that in this particular instance, the district court got it exactly right. The injunction protects my patients. It protects their conscience. The memorandum infringes on their conscience rights because it pressures them. It pressures them to violate those rights. In the specific instance, certainly, of incomplete medical abortions, but certainly in instances where the judgment calls are up in the air. That is left to state law. That is committed to state law, as my colleague has pointed out under 1395. Federal law was never meant to create a federal standard of care. And the last thing I want to point out, your honors, I see my time is nearly up. My friends on the other side have argued in their briefing a fairly astounding thing. And it's in their brief at page 30. They say, EMTALA mandates, I'm quoting from page 30, whatever a medical provider concludes is necessary to stable whatever condition is present. That is a breathtaking statement. That would pulverize state law and make state law purely contingent upon the judgment of individual physicians. Your honor, I would submit that presents a major question. A major takeover by federal law of state practice guidelines, ethical guidelines, and the practice of medicine. And your honors, I would submit you should not countenance that kind of power grab by the federal government. Thank you. Thank you, your honor. Just a few points that I want to address that were raised by my friends on the other side. And the first is to underscore the very narrow circumstances in which the government is saying there will be this kind of direct conflict in which state law is preempted. Where you have a run-of-the-mill bona fide state regulation of medical practice, it's hard to see why that would interfere with a doctor's ability to provide stabilizing treatment. It's really only when state law is coming in and preventing physicians from exercising that medical judgment that a physician wouldn't be able to provide any care that would meet the definition in E3A. And under those circumstances only, we're saying state law is preempted because of that physical impossibility of following both. And that also goes to, your honor, the reliance on patient dumping and that objective of the statute. And understanding what EMTALA is trying to do. Essentially, Congress was trying to address a situation where hospitals were not providing adequate stabilizing care for individuals. They were turning them away at the door or providing some care, but not complete care to ensure stabilization. And so Congress enacted a statute with an express preemption provision that said, state law that conflicts with these requirements that doesn't ensure adequate stabilization under the statute is preempted. And it simply doesn't make sense to say that state law confines the universe of permissible care when the objective of EMTALA was to override state laws that were insufficient in providing that care. Essentially, to provide care that is just coextensive with state law means that under certain circumstances, physicians cannot adequately stabilize an emergency medical condition to ensure that it will prevent material deterioration. Well, counsel, it seems to me this statute really has to do with the other concept of patient dumping. And it's being converted by HHS through his guidance into an abortion statute, I guess. I mean, that may be harsher than it should be, but it does seem to me what you just said is really the core of the statute. And what we're arguing about is not the core of the statute. It's this narrow area when the recommended emergency care may be for something that is not endangering the life of the mother, which is all Texas law would protect if abortion. And the broader categories of things, mental health, I don't know, whatever else HHS would say an abortion is required for, even though it's not the life of the mother. So this very narrow area is being put into this statute dealing with patient dumping. And that's one of the extraordinary things, it seems to me, about this guidance. Well, Your Honor, as this court recognized in Burdett, patient dumping is an objective, but it's not the only objective of the statute. And the statute that Congress actually wrote doesn't limit anything to indigency or patient dumping. It creates these standards and requires hospitals. Emergency care for stabilizing patients before they ship someplace else. Isn't what the statute's about? Yes, or discharge, Your Honor. Or discharge, ship home rather than someplace else. Yes, Your Honor, and Congress was trying to ensure that hospitals were providing adequate levels of stabilizing care to individuals and didn't see fit to create any exceptions to that requirement. It didn't carve out abortion or any other forms of care, and it didn't incorporate state law into that definition. Instead, it has an express preemption provision  from exercising their medical judgment in stabilizing a condition. That law, to the extent of that conflict, is preempted. To the extent we might agree with you on the injunction being overbroad, how would you narrow it? Yes, Your Honor, if the court agrees that the injunction is overbroad but adopts a plaintiff's view of the statute, then the injunction should be narrowed to say that HHS cannot enforce EMTALA within the state of Texas where the care that would constitute stabilizing treatment would be contrary to state law. That if there are abortions in Texas that are permissible under state law, that would be stabilizing treatment under E3A, that HHS is allowed to enforce EMTALA in order to require hospitals to offer that care. And why is that important? It's important, Your Honor, because there are circumstances in which individuals presenting to emergency rooms suffering from these emergency medical conditions, right now HHS can't ensure that the hospitals are following their obligations and offering the care that's required under those circumstances. Texas law might not prohibit the care, but HHS is part of its role in enforcing these Medicare conditions is to ensure that the care is offered when it is required under the statute. And so it is significant. And the errors in the district court's opinion in interpreting the statute, Your Honor, are significant errors in statutory interpretation that do have potentially devastating consequences for pregnant women within the state of Texas. And if there are no further questions, for that reason, we ask this court, for those reasons, we ask this court to reverse. JUSTICE KENNEDY All right, Counsel. CANDIDATE COOK Thank you. JUSTICE KENNEDY A very important, somewhat complex case. Appreciate both sides' assistance in helping us understand what's before us.